

# IN THE
# TENTH COURT OF APPEALS

## No. 10-14-00274-CV

**CLINTON W. (BUDDY) PIKE, SR., DANIEL L. WALKER,
W. TOBIN WILSON, VHSC CEMENT, LLC
AND FEW READY MIX CONCRETE CO.,**

                                                    **Appellants**

 **v.**

**TEXAS EMC MANAGEMENT, LLC, TEXAS EMC
PRODUCTS, LP AND EMC CEMENT, BV,**

                                                    **Appellees**

---

**From the 77th District Court
Limestone County, Texas
Trial Court No. 30,023-A**

---

## MEMORANDUM OPINION

---

In numerous issues, appellants, Clinton W. Pike Sr., Daniel L. Walker, W. Tobin Wilson, VHSC Cement, LLC, and Few Ready Mix Concrete, challenge a judgment in favor of appellees, Texas EMC Management, LLC, Texas EMC Products, LP, and EMC Cement, BV, stemming from the breakup of a partnership and the subsequent purchase of the partnership's assets at a foreclosure sale. In a cross-appeal, EMC Management,

EMC Products, and EMC Cement complain about the trial court's denial of their request for a permanent injunction in favor of cross-appellees, Pike, Walker, Wilson, VHSC, and Few Ready Mix.[1]  After review, we modify the Amended Final Judgment to delete Pike's liability for breach of his Management Agreement with EMC Products and affirm the judgment in all other respects.  We also reverse the trial court's denial of the permanent injunction and remand for proceedings consistent with this opinion.[2]

## I.    SUFFICIENCY OF THE EVIDENCE

Here, appellants raise sufficiency challenges with regard to aspects of the Amended Final Judgment.  In a legal-sufficiency review, we consider the evidence in the light most favorable to the verdict, indulging every reasonable inference in favor of the verdict.  *Autozone, Inc. v. Reyes*, 272 S.W.3d 588, 592 (Tex. 2008) (per curiam); *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 286 (Tex. 1998).  To determine whether legally-sufficient evidence supports a challenged finding of fact, we credit evidence that supports the finding if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not.  *See Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006); *see also City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005).  The factfinder is the sole judge of the credibility of the witnesses and the weight to be

---

[1] As this is a memorandum opinion and the parties are familiar with the facts, we only recite those necessary to the disposition of the case.  *See* TEX. R. APP. P. 47.1, 47.4.

[2] We withdraw our opinion and judgment of May 31, 2017, and substitute this memorandum opinion and judgment to make non-dispositive changes.

assigned to their testimony. *See City of Keller*, 168 S.W.3d at 819. The factfinder is free to believe one witness and disbelieve another, and reviewing courts may not impose their own opinions to the contrary. *Id.* As such, reviewing courts must assume that the factfinder decided all credibility questions in the favor of the findings and chose what testimony to disregard in a way that was in favor of the findings, if a reasonable person could do so. *Id.* at 819-20.

Additionally, it is within the factfinder's province to resolve conflicts in the evidence. *Id.* at 820. Consequently, we must assume that, where reasonable, the factfinder resolved all conflicts in the evidence in a manner consistent with the findings. *Id.* Where conflicting inferences can be drawn from the evidence, it is within the province of the factfinder to choose which inference to draw, so long as more than one inference can reasonably be drawn. *Id.* at 821. Thus, we must assume that the factfinder made all inferences in favor of the findings if a reasonable person could do so. *Id.* As stated in *City of Keller*, the final test for legal sufficiency must always be "whether the evidence at trial would entitle reasonable and fair-minded people to reach the verdict under review." *Id.* at 827. Anything more than a scintilla of evidence is legally sufficient to support the finding. *See Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996).

In a factual-sufficiency challenge, an appellate court must consider and weigh all of the evidence. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). The verdict should be set aside only if it is so contrary to the overwhelming weight of the evidence

as to be clearly wrong and unjust. *Id.* We may not pass upon the witnesses' credibility or substitute our judgment for that of the factfinder, even if the evidence would support a different result. *2900 Smith, Ltd. v. Constellation New Energy, Inc.*, 301 S.W.3d 741, 746 (Tex. App.—Houston [14th Dist.] 2009, no pet.). If we determine the evidence is factually insufficient, we must detail the evidence relevant to the issue and state in what regard the contrary evidence greatly outweighs the evidence supporting the trial court's judgment; we need not do so when affirming the judgment. *Id.*

## II. BREACH-OF-CONTRACT CLAIMS AGAINST WALKER AND WILSON

In their second issue, Walker, Wilson, and Few Ready Mix argue that appellees' breach-of-contract claim against Walker and Wilson is invalid as a matter of law, arguing, among other things, that: (1) the failure to provide an infinite amount of money was not a breach of the Partnership Agreement; and (2) appellees breached the Partnership Agreement first. Walker, Wilson, and Few Ready Mix also contend that EMC Cement lacks standing to recover for diminished value of the partnership; that the attorney's fees award is improper; and that the amount awarded to Walker and Wilson for appellees' breach of the Partnership Agreement was incorrect.

### A. Standing

Because it is a threshold matter, we will first consider the standing argument. "Standing is a constitutional prerequisite to maintaining suit in either federal or state court." *Williams v. Lara*, 52 S.W.3d 171, 178 (Tex. 2001) (citing *Tex. Ass'n of Bus. v. Tex. Air*

*Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993)). Standing "focuses on whether a party has a sufficient relationship with the lawsuit so as to have a 'justiciable interest' in its outcome." *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 848 (Tex. 2005). Essentially, parties have standing when they are personally aggrieved, regardless of whether they are acting with legal authority. *See Nootsie, Ltd. v. Williamson County Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996).

On appeal, Walker, Wilson, and Few Ready Mix assert that EMC Cement lacks standing to bring a claim against Walker and Wilson for breach of the Partnership Agreement because the cause of action belongs to the partnership, not the individual partners. Appellees counter that this argument involves capacity and, as such, has been waived by a failure to file a verified denial under Texas Rule of Civil Procedure 93. *See* TEX. R. CIV. P. 93.

Capacity is a procedural issue dealing with the personal qualifications of a party to litigate. *See Lovato*, 171 S.W.3d at 848; *see also Hubbard v. Rosenthal*, No. 10-10-00267-CV, 2012 Tex. App. LEXIS 4391, at *9 (Tex. App.—Waco May 30, 2012, pet. denied) (mem. op.). "[A] party has capacity when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy." *Lovato*, 171 S.W.3d at 848-49; *see El T. Mexican Rests. v. Bacon*, 921 S.W.2d 247, 250 (Tex. App.—Houston [1st Dist.] 1995, no writ) (stating that capacity is a party's legal authority to go to court to prosecute or defend a suit). While standing may be raised for the first time on appeal, capacity must be raised

by verified plea in the trial court or else it is deemed waived. *See Lovato*, 171 S.W.3d at 849; *see also Sixth RMA Partners, L.P. v. Sibley*, 111 S.W.3d 46, 56 (Tex. 2003).

We characterize the standing argument as a challenge to EMC Cement's right to recover in the capacity in which it filed suit.[3] In other words, we conclude that Walker, Wilson, and Few Ready Mix's argument that EMC Cement did not have authority to prosecute this lawsuit because that authority belonged to the partnership involves capacity, not standing. *See Pledger v. Schoellkopf*, 762 S.W.2d 145, 145-46 (Tex. 1988) (per curiam) (holding that the question whether claims brought by shareholders belonged to the corporation involved capacity); *see also Baker v. City of Robinson*, 305 S.W.3d 783, 788 (Tex. App.—Waco 2009, pet. denied) (concluding that an individual's alleged lack of standing to recover lost profits suffered by a partnership was really an issue of capacity); *WHM Props. v. Dallas County*, 119 S.W.3d 325, 330-31 (Tex. App.—Waco 2003, no pet.) (holding that an issue presented as a "standing" challenge pertaining to corporate status actually involved "capacity"). And because the record does not contain a verified plea

---

[3] And even if Walker, Wilson, and Few Ready Mix's argument involved standing, we note that section 152.210 of the Texas Business Organizations Code provides:

A partner is liable to a partnership and the other partners for:

    (1) A breach of the partnership agreement; or

    (2) A violation of a duty to the partnership or other partners under this chapter that causes harm to the partnership or the other partners.

TEX. BUS. ORG. CODE ANN. § 152.210 (West 2012). In other words, section 152.210 would have conferred standing on EMC Cement, a Class A limited partner. *See id.*

filed in the trial court under Texas Rule of Civil Procedure 93, we conclude that this argument has been waived.  *See* TEX. R. CIV. P. 93; *see also Lovato*, 171 S.W.3d at 849; *Sixth RMA Partners, L.P.*, 111 S.W.3d at 56.

### B.  The Partnership Agreement

Next, we will address Walker, Wilson, and Few Ready Mix's arguments regarding the Partnership Agreement.

The partners in EMC Products, a Texas limited partnership, are EMC Management, EMC Cement, Walker and certain members of his family, and Wilson. EMC Management is a general partner with a 1% share in the partnership.  EMC Cement is a Class A limited partner with a 49.5% ownership stake.  Walker and his family and Wilson are Class B limited partners with a collective 49.5% ownership share in the partnership.  Under the Partnership Agreement, the following was required of Class B limited partners Walker and Wilson:

> **Section 2.5.  Financing Assistance by Class B Limited Partners.**  The Class B Limited Partners shall loan funds to and/or obtain financing for the Partnership to meet the Primary Objective until such time as the Partnership has the financial ability to obtain such financing on its own resources.  The General Partner and the Class A Limited Partner shall have no obligation to make loans to and/or obtain financing for the Partnership.

Section 1.5 of the Partnership Agreement outlines the primary objective of the Partnership as follows:  "The Partners agree that the primary objective of the partnership will be to maximize the degree and speed of market penetration for the Products in the

State of Texas, in accordance with market demand and potential, respecting sound business principals."

The usage of the term "shall" in Section 2.5 of the Partnership Agreement imposed a mandatory duty on Walker and Wilson to loan funds and/or obtain financing. *See Lesikar v. Moon*, 237 S.W.3d 361, 367 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) ("The word 'shall' as used in contracts is generally mandatory, operating to impose a duty." (internal citations omitted)); *In re J.L.W.*, 919 S.W.2d 841, 842 (Tex. App.—El Paso 1996, no writ) (stating that the term "shall" is generally construed to be mandatory and may also be considered as directory). However, despite this language, Walker, Wilson, and Few Ready Mix assert that their duty to loan or obtain funds was limited by the "sound business principals" language of the primary objective, and thus, the failure to provide an infinite amount of money did not constitute a breach of the agreement.

We do not agree with Walker, Wilson, and Few Ready Mix's interpretation of the Partnership Agreement. The "sound business principles" language modifies the language about the partnership's goal of maximizing market penetration, not Walker and Wilson's obligation to loan funds and/or obtain financing for the partnership. The interpretation advanced on appeal by Walker, Wilson, and Few Ready Mix would require us to rewrite the agreement to move the "sound business principles" language from Section 1.5 to Section 2.5 of the Partnership Agreement—something we cannot do. *See*

*Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex. 2003) ("But we may neither rewrite the parties' contract nor add to its language.").

And to the extent that Walker, Wilson, and Few Ready Mix contend that they did not have to provide further financing because the partnership was unable to meet the primary objective, we note that such a contention raises the affirmative defense of excuse—something that Walker and Wilson had to plead and prove in the trial court. *See* TEX. R. CIV. P. 94; *see also Trencor, Inc. v. Cornech Mach. Co.*, 115 S.W.3d 145, 153 (Tex. App.—Fort Worth 2003, pet. denied). A review of the record reveals that they did neither. As such, Walker and Wilson waived any excuse argument brought on appeal. *See AMS Const. Co. v. K.H.K. Scaffolding Houston, Inc.*, 357 S.W.3d 30, 43 (Tex. App.—Houston [1st Dist.] 2011, pet. dism'd); *see also RE/MAX of Tex., Inc. v. Katar Corp.*, 961 S.W.2d 324, 327 (Tex. App.—Houston [1st Dist.] 1997, writ denied) (noting that excuse is an affirmative defense and thus is waived if not pleaded or tried by consent).

Additionally, Walker, Wilson, and Few Ready Mix argue that Walker and Wilson's breach of the Partnership Agreement was excused because of the jury's finding that EMC Products also breached the agreement. Irrespective of the excuse affirmative defense that was not pleaded in the trial court, the jury concluded that Walker and Wilson were the first to breach the Partnership Agreement. However, whether EMC Products or Walker and Wilson breached first is immaterial because of the well-settled rule that when a party materially breaches an agreement, the non-breaching party can elect to either rescind the

agreement or affirm and seek damages, but not both. *See Texana Oil Co. v. Stephenson*, 521 S.W.2d 104, 106-07 (Tex. App.—El Paso 1975, no writ). Therefore, "[t]reating a contract as continuing, after a breach, deprives the non-breaching party of any excuse for terminating their own performance." *Chilton Ins. Co. v. Pate & Pate Enters., Inc.*, 930 S.W.2d 877, 888 (Tex. App.—San Antonio 1996, writ denied) (citing *W. Irrigation Co. v. Reeves County Land Co.*, 233 S.W.2d 599, 602 (Tex. Civ. App.—El Paso 1950, no writ)).

Here, Walker and Wilson continued to perform under the Partnership Agreement, despite the purported breach by EMC Products and then sought damages. *See id.* ("Seeking to recover damages under the contract, as Pate did, is evidence that Pate considered the contract as continuing." (citing *Cox, Colton, Stoner, Starr and Co., P.C. v. Deloitte, Haskins & Sells*, 672 S.W.2d 282, 286-87 (Tex. App.—El Paso 1984, no writ))). At the point in time that Walker and Wilson believed that EMC Products breached the agreement, they were faced with one of two mutually-exclusive courses of action: (1) discontinue their performance, rescind the contract, and sue for material breach; or (2) continue performing and lose the other party's material breach as an excuse for its own non-performance. *Id.* (citing *W. Irrigation Co.*, 233 S.W.2d at 602). Therefore, because Walker and Wilson chose to continue performing their duties under the Partnership Agreement after they believed EMC Products breached the agreement, Wilson and Walker forfeited any excuse for their own breach. *See id.* ("By its actions, Pate chose the

latter.  Because Pate treated the contract as continuing after Chilton's material breach, Pate forfeited any excuse for its own breach.").

Having rejected Walker, Wilson, and Few Ready Mix's complaints about the jury's breach-of-contract finding, we therefore overrule their second issue.[4]

### III.    CIVIL CONSPIRACY & JOINT AND SEVERAL LIABILITY

In their third issue, Walker, Wilson, and Few Ready Mix argue that appellees' joint-and-several liability theories fail as a matter of law for a number of reasons:  (1) the evidence supporting underlying tort liability is lacking; (2) that the "knowingly participated" theory cannot be a valid basis for joint-and-several liability; and (3) the conspiracy theory is flawed.

### A.    Applicable Law

The elements of civil conspiracy are (1) two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result.  *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005); *see BP Auto., L.P. v. RML Waxahachie Dodge, LLC*, 448 S.W.3d 562, 573 (Tex. App.—Houston [1st Dist.] 2014, no pet.).  Civil conspiracy "'requires specific intent' to agree 'to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful

---

[4] Because we believe that Walker, Wilson, and Few Ready Mix's complaints about attorney's fees and the damages awarded to them are best categorized in a separate section, we will consider these complaints later in this memorandum opinion.

means.'" *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996) (quoting *Triplex Comm'cns, Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex. 1995)).

"[O]nce a civil conspiracy is found, each co-conspirator is responsible for the action of any of the co-conspirators which is in furtherance of the unlawful combination." *Akin v. Dahl*, 661 S.W.2d 917, 921 (Tex. 1983) (citing *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 926 (Tex. 1979)). "A finding of civil conspiracy imposes joint and several liability on all conspirators for actual damages resulting from acts in furtherance of the conspiracy." *Energy Maint. Servs. Group, LLC v. Sandt*, 401 S.W.3d 204, 220 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (citing *Carroll*, 592 S.W.2d at 925-26; *Greenberg Traurig of N.Y., P.C. v. Moody*, 161 S.W.3d 56, 90 (Tex. App.—Houston [14th Dist.] 2004, no pet.)).

## B.     Discussion

Ronin and Lygren both testified that, in 2008 and 2009, they began negotiating with C-Change in California about financing, developing, and commercializing EMC Cement's intellectual property. According to Ronin and Lygren, John Preston, a managing partner of C-Change, and Alan Quasha, the president of Quadrant Management, were involved in the negotiations. Lygren noted that Walker and Wilson were aware of the C-Change negotiations, though Wilson's testimony implied that he was unaware of the negotiations. Nevertheless, as a result of the negotiations, Ronin, Lygren, and C-Change executed a letter of intent calling "for C-Change to commit to

contribute a maximum investment of 50 million dollars to . . . California, 49 million to the company and a million to the idea" in exchange for a 51% equity interest in a holding company formed to develop and commercialize EMC Cement technology in California. Beginning in 2010, Quasha and Preston spoke with Walker and Wilson several times. Apparently, Quasha and Preston told Walker and Wilson that they wanted to buy EMC Products' business but did not want to enter into an agreement with Lygren. Both Ronin and Lygren testified that they were unaware that Quasha and Preston were communicating with Walker and Wilson. In any event, in December 2010, EMC Cement called off negotiations with C-Change.

In January 2011, Walker and Wilson, frustrated with the actions of Lygren and Ronin, decided to stop making the monthly $25,000 payments on EMC Products' loan with Texas Capital Bank, thereby causing the partnership to default on an underlying loan. Phillip Wood, Texas Capital Bank's Executive Vice President, testified that Walker and Wilson had stated that their goal was to end their relationship with Lygren and allow Quasha and Preston to buy EMC Products' assets at a foreclosure sale following the default. These plans were subsequently relayed to Quasha and Preston, according to the testimony.

Lygren recounted that, in February 2011, Wilson told Wood that a group represented by Quasha was interested in EMC Products—a sentiment that Quasha

confirmed to Wood. On April 12, 2011, Texas Capital Bank noticed the foreclosure of EMC Products' assets for May 3, 2011.

VHSC formed on April 28, 2011. The company is owned by INEA International, Limited, a company purportedly closely associated with Quasha and Preston. According to Wood, Wilson put together the potential sale of the loan to INEA, which led to Quasha entering into discussions with the bank. These discussions allegedly resulted in a draft agreement that designated Quasha as the sole primary contact for purposes of the agreement.

Also in April 2011, Lygren informed the bank that EMC Products' license from EMC Cement was "neither assignable nor transferable" and that the foreclosure proceedings would result in the disclosure of intellectual property belonging to EMC Cement. Lygren also noted that the bank had no right to foreclose and that legal action would be taken if the foreclosure was to proceed. Lygren then notified Walker a couple of days before May 3, 2011, that EMC Cement had terminated the license agreement with EMC Products.

Upon receiving Lygren's notices, the bank decided not to conduct the foreclosure sale. However, Walker and Wilson coordinated the purported sale of the loan to Few Ready Mix, Walker's company, so that Few Ready Mix could foreclose on EMC Products' assets on May 3, 2011. To facilitate the purported sale of the loan, Walker and Wilson both wired over $1.9 million to the bank on behalf of Few Ready Mix. Thereafter, Few

Ready Mix sold EMC Products' assets to VHSC at the May 3, 2011 foreclosure sale. Wilson served as the trustee, and Preston was the bidder at the foreclosure sale.

VHSC bought EMC Products' assets for $3,126,090; however, the winning bid left an approximate $800,000 deficiency on the loan. In any event, Walker testified that he and Wilson equally shared the proceeds from the sale. A day later, Few Ready Mix sold the loan agreement to VHSC for $300,000. Walker and Wilson once again equally split the proceeds from the sale. And within days of the sale, VHSC began selling products produced by EMC Cement's purported trade secrets.

Based on the evidence outlined above, and viewing the evidence in the light most favorable to the jury's verdict, we conclude that a rational factfinder could determine that Walker, Wilson, and Few Ready Mix worked together to achieve the common goal of delivering EMC Cement's trade secrets to Quasha and Preston at VHSC by breaching the Partnership Agreement, defaulting on the loan, and ensuring that EMC Products' assets were sold to VHSC at the foreclosure sale—acts that resulted in damage to EMC Cement. *See Tri*, 162 S.W.3d at 556; *Juhl*, 936 S.W.2d at 644; *Riley*, 900 S.W.2d at 719; *BP Auto., L.P.*, 448 S.W.3d at 573; *see also Reyes*, 272 S.W.3d at 592; *City of Keller*, 168 S.W.3d at 822. Furthermore, we cannot say that the jury's verdict as to the civil-conspiracy claim is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176. Accordingly, we conclude that the evidence supporting the

jury's finding of civil conspiracy against Walker, Wilson, and Few Ready Mix is supported by legally- and factually-sufficient evidence. We overrule their third issue.[5]

## IV. CUMULATIVE ERROR

In their fourth issue, Walker, Wilson, and Few Ready Mix assert that the trial court's alleged cumulative errors "probably led to the rendition of an improper result." We disagree.

### A. Applicable Law

---

[5] In this issue, Walker, Wilson, and Few Ready Mix also appear to argue that civil conspiracy only applies to dangerous activities and that the issue was improperly submitted to the jury. First, we note that the "purpose of the concert of action theory is to deter antisocial or dangerous behavior." *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996) (citations omitted). Concert of action "imposes liability not for an agreement, but for substantially assisting and encouraging a wrongdoer in a tortious act." *Id.* However, in analyzing Airington's claims, the *Juhl* Court considered civil conspiracy and the concert-of-action theory as separate theories. *See id.* (noting that "[b]ecause Airington's pleadings allege only that defendants were negligent, civil conspiracy is not a theory upon which he could have relied to avoid summary judgment" and subsequently analyzing Airington's concert-of-action theory). We therefore are not persuaded by Walker, Wilson, and Few Ready Mix's assertion that civil conspiracy only applies to dangerous activities.

Additionally, we reject Walker, Wilson, and Few Ready Mix's complaint about the jury charge. In their brief, Walker, Wilson, and Few Ready Mix invoke *Casteel* and argue that the conspiracy question was impermissibly commingled with valid and invalid liability grounds. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388 (Tex. 2000) (reversing for a new trial due to the erroneous commingling of valid and invalid liability theories in a single broad-form liability question). At trial, Walker, Wilson, and Few Ready Mix did not raise a *Casteel* objection to the conspiracy question. *See Burbage v. Burbage*, 447 S.W.3d 249, 255-56 (Tex. 2014) ("Thus, in *Casteel*, we required a new trial when a timely and specific objection preserved the issue of erroneous commingling of valid and invalid theories of liability in a broad-form liability question, such that the appellate court could not determine whether the jury based its verdict on an improperly submitted theory. . . . [I]n situations where a party does not raise a *Casteel*-type objection, that party surely cannot raise a *Casteel* issue when it failed to preserve a claim of an invalid theory of liability that forms the basis of a *Casteel*-type error."). Rather, Walker, Wilson, and Few Ready Mix objected that the conspiracy question was not supported by the evidence and that the question was duplicative of the aiding and abetting question associated with the breach-of-fiduciary-duty questions. As such, we conclude that this argument was waived. *See Burbage*, 447 S.W.3d at 255-56.

"A reviewing court may reverse a lower-court judgment under the cumulative-error doctrine when the record shows a number of instances or error, no one instance being sufficient to call for reversal, yet all instances taken together may do so." *Rhey v. Redic*, 408 S.W.3d 440, 462 (Tex. App.—El Paso 2013, no pet.) (citing *Sproles Motor Freight Lines, Inc. v. Long*, 140 Tex. 494, 168 S.W.2d 642, 645 (1943); *Univ. of Tex. at Austin v. Hinton*, 822 S.W.2d 197, 205 (Tex. App.—Austin 1991, no writ)). "To show cumulative error, an appellant must show that, based on the record as a whole, but for the alleged errors, the jury would have rendered a verdict favorable to it." *Id.* (citing *Hinton*, 822 S.W.2d at 205).

## B. Discussion

In this issue, Walker, Wilson, and Few Ready Mix point to several instances that they assert demonstrate cumulative error. Specifically, they complain that the trial court improperly: (1) included fiduciary-duty questions in the charge; (2) admitted Plaintiff's Exhibit 129 into evidence over their objection; (3) overruled their motion for directed verdict on several claims; and (4) allowed questioning about the failure to disclose discussions surrounding the purchase of the EMC Products note. Based on our review of the record and our analysis of prior issues, there is sufficient evidence to support the jury's liability findings against Walker, Wilson, and Few Ready Mix. And as such, we cannot say that, based on the record as a whole, but for the alleged errors, the jury would have rendered a verdict in favor of Walker, Wilson and Few Ready Mix. *See Long*, 168 S.W.2d at 645; *see also Rhey*, 408 S.W.3d at 462; *Hinton*, 822 S.W.2d at 205. Accordingly,

Walker, Wilson, and Few Ready Mix have not satisfied their burden in this issue. *See Long*, 168 S.W.2d at 645; *see also Rhey*, 408 S.W.3d at 462; *Hinton*, 822 S.W.2d at 205. We overrule Walker, Wilson, and Few Ready Mix's fourth issue.

## V. TRADE-SECRET MISAPPROPRIATION

In their first issue, VHSC and Pike assert that EMC Cement's trade-secret claim fails as a matter of law.

### A. Applicable Law

A trade secret is "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003). "There must be a substantial amount of attendant secrecy for information to be a trade secret." *Sw. Energy Prod. Co. v. Berry-Helfand*, 411 S.W.3d 581, 597 (Tex. App.—Tyler 2013, pet. granted) (citing *Rugen v. Interactive Bus. Sys., Inc.*, 864 S.W.2d 548, 552 (Tex. App.—Dallas 1993, no writ)). "[A] trade secret can exist in a combination of characteristics and components[,] each of which, by itself, is in the public domain, but the unified process, [the] design and operation of which in unique combination[] affords a competitive advantage, is a protected trade secret." *Id.* (citing *Metallurgical Indus. v. Fourtek, Inc.*, 790 F.2d 1195, 1202 (5th Cir. 1986)). "A trade secret is not necessarily destroyed by a disclosure, but, in disclosing a trade secret, the owner must establish a confidential relationship with the other party, by contract or otherwise, or the secret will be lost by

the disclosure."  *Id.* (citing *Furr's, Inc. v. United Specialty Adver. Co.*, 385 S.W.2d 456, 459 (Tex. App.—El Paso 1964, writ ref'd n.r.e.).  With respect to "use," Texas law has adopted the Restatement definition:

> Any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a "use" under this Section.  Thus, marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret . . . all constitute "use."

*Bohnsack v. Varco, L.P.*, 668 F.3d 262, 279 (5th Cir. 2012) (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 40 cmt. c (1995)); *see Sw. Energy Prod. Co.*, 411 S.W.3d at 597.

Under Texas law, trade-secret misappropriation requires:  (1) the existence of a trade secret; (2) a breach of a confidential relationship or improper discovery of the trade secret; (3) use of the trade secret; and (4) damages.  *See Bohnsack,* 668 F.3d at 279; *see also Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 463 (Tex. App.—Austin 2004, pet. denied); *IBP, Inc. v. Klumpe*, 101 S.W.3d 461, 476 (Tex. App.—Amarillo 2001, pet. denied).  Proof of trade-secret misappropriation often depends upon circumstantial evidence.  *Sw. Energy Prod. Co.*, 411 S.W.3d at 598 (citing *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1261 (3d Cir. 1985)).

## B.     Discussion

At trial, Ronin testified about the information that EMC Cement maintained as trade secrets and about specific documents that contained trade-secret information. Specifically, Ronin described confidential Mill Records and test reports from 2010 that

contain specific details about EMC Cement processes. Ronin explained that the records show the test results of processing materials through high-energy vibratory-ball mills ("VBM") under different conditions. According to Ronin, the tests show that changing the speed at which fly ash is fed through the mill affects the final product. Additionally, the tests indicate the effects of varying the size and weight of the grinding media, the particle size of the fly ash, and the configuration of the openings on the mill wall. Ronin testified that these test results and records were not intended to be disclosed to the public because they were trade secrets.

Ronin also explained the he did fill out a patent application for the VBMs, but that he purposely excluded certain information to prevent it from being released to the public. Ronin noted that: "We didn't include information related to an exact positioning of the openings, an exact configuration of the openings, an exact size of the openings related to different rates, through capacities of the mill. So this whole element you always keep it out like the trade secret—know how." He denied including the aforementioned Mill Records and reports from 2010 in the patent application.

In later testimony, Ronin stated that EMC Cement maintained information as trade secrets about the grinding media—i.e., the ceramic balls—within the mills, the frequency and amplitude of the mill's vibrations, data regarding the alteration of fly ash in the mill, and the results of performance tests on two EMC products, CemPozz and PozzoSlag. Ronin also testified that these trade secrets gave EMC Cement a competitive advantage

over its competitors in the cement industry because EMC Cement was the "one company who's doing this" and that EMC Cement had always taken measures to protect and guard the secrecy of the trade-secret information.

The record reflects that Pike, the former general manager of EMC Products who eventually became President of VHSC, included the Mill Records in the patent application he filed on May 6, 2011, just three days after VHSC acquired the EMC assets at the foreclosure. With regard to the Mill Records, Pike testified that "[t]he data belonged to Texas EMC but what we did with that data and how we modified that mill, particularly the mill, I felt like it was the mill modification nothing to do with the process." Nevertheless, Pike admitted that this information was EMC's trade secrets and that it contained highly-sensitive information.

Based on our review of the evidence, a rational factfinder could conclude that EMC Cement identified its trade secrets at trial; that Pike used his position at EMC Products to obtain the trade-secret information that ultimately benefitted his new employer, VHSC— a competitor of EMC Products; that Pike used the information in his patent application and VHSC used the information to produce cement subsequent to the foreclosure sale; and that the use of the trade-secret information caused EMC Cement damage. *See Bohnsack*, 668 F.3d at 279; *Sw. Energy Prod. Co.*, 411 S.W.3d at 598; *Trilogy Software, Inc.*, 143 S.W.3d at 463; *Klumpe*, 101 S.W.3d at 476. Therefore, viewing the evidence in the light most favorable to the jury's verdict, we conclude that the trade-secret-misappropriation

finding is supported by legally-sufficient evidence. *See Reyes*, 272 S.W.3d at 592; *City of Keller*, 168 S.W.3d at 822; *see also Bohnsack*, 668 F.3d at 279; *Sw. Energy Prod. Co.*, 411 S.W.3d at 598; *Trilogy Software, Inc.*, 143 S.W.3d at 463; *Klumpe*, 101 S.W.3d at 476. Additionally, we cannot say that the jury's verdict as to this claim is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176. Thus, we further conclude that the jury's finding as to this claim is supported by factually-sufficient evidence. *See id.*

However, despite our conclusion that the jury's finding on the trade-secret-misappropriation claim is supported by legally- and factually-sufficient evidence, VHSC and Pike contend that EMC Cement consistently disclosed its "secret" technology in patent applications and public materials; therefore, there was no trade secret to misappropriate. In addition, VHSC and Pike allege that they were authorized to use any trade secrets that EMC Cement might have had based on licenses acquired in the foreclosure sale.

The record includes testimony from Ronin, the inventor of the process, about the methods and tools he developed over time for activating fly ash and the data collected from years of experimentation. And as outlined above, information related to the unique configuration, use, and maintenance of the VBMs used to produce CemPozz and PozzoSlag were kept as trade secrets within the company and were not disclosed to the public in advertising materials or in a patent application filed by Ronin. In fact, Ronin

testified that he purposefully excluded certain trade-secret information from his patent application to protect it from disclosure to the public. Ronin also noted that PozzoSlag, for example, could not be reproduced using only the information contained in the patent application. The disputed trade-secret information was needed to replicate PozzoSlag. Moreover, the record reveals that it was Pike, not Ronin, who disclosed EMC Cement trade-secret information to the public via his patent application.

In addition, we are not persuaded by VHSC and Pike's contention that they were authorized to use EMC Cement's trade secrets by virtue of the licenses acquired in the foreclosure sale. The Deed of Trust acquired after the foreclosure sale provided the following definition for "Contracts": [A]ll of the right, title and interest of [EMC Products], including equitable rights, in, to, and under any and all . . . contracts, licenses, or permits which are directly or indirectly related to, or connected with, the development, ownership, maintenance or operation of the [cement plant]." Despite this language, Lygren testified that EMC Cement terminated the License Agreement before the foreclosure sale. To corroborate Lygren's testimony, appellees included an email dated April 20, 2011, notifying Walker that EMC Products' rights under the License Agreement with EMC Cement had been cancelled. Therefore, at the time of the foreclosure sale, EMC Products had no license to convey to VHSC, and thus, VHSC could not have acquired use of EMC Cement's trade secrets by virtue of the License Agreement. Accordingly, we

reject VHSC and Pike's arguments with regard to the trade-secret-misappropriation finding and overrule their first issue.

## VI. BREACH OF CONTRACT, TORTIOUS INTERFERENCE WITH AN EXISTING CONTRACT, & CONSPIRACY

In their second issue, VHSC and Pike argue that appellees' tortious-interference, breach-of-contract, and conspiracy claims fail as a matter of law.

### A. Applicable Law

The elements of a breach-of-contract claim are: (1) the existence of a valid contract between plaintiff and defendant; (2) the plaintiff's performance or tender of performance; (3) the defendant's breach of the contract; and (4) the plaintiff's damage as a result of the breach. *Runge v. Raytheon E-Systems, Inc.*, 57 S.W.3d 562, 565 (Tex. App.—Waco 2001, no pet.). On the other hand, the elements for a cause of action for tortious interference with a contract are: (1) an existing contract subject to interference; (2) a willful and intentional act of interference with the contract; (3) that proximately caused the plaintiff's injury; and (4) caused actual damage or loss. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000).

### B. Discussion

In 2006, appellees hired Pike as the general manager to oversee day-to-day operations for EMC Products. As a condition of his employment, Pike signed a Management Agreement, which provided that, among other things, he agreed to be

bound by the confidentiality provisions of EMC Products' License Agreement with EMC

Cement. Specifically, the Management Agreement provides the following:

> The Manager agrees that he is subject to the same obligations of confidentiality and secrecy with respect to the Company's or Ltd's Confidential Information as set out in the License Agreement attached as Exhibit B hereto for a duration of his engagement with the Company and for a period of 10 (ten) years following his termination, irrespective of the circumstances of which termination took place.
>
> . . . .
>
> For the duration of this Agreement, and any extension thereof, all rights to intellectual property related to the Company's or Ltd.'s business belongs to the Company or Ltd., respectively, including but not limited to intellectual property under development or under consideration for development, with or without the participation of the Manager.
>
> Moreover, the Manager may not use information gleaned about the EMC Technology for purposes other than to benefit EMC, Ltd. or the Company.

The attached Licensing Agreement stated that:

> "Technical Data" shall mean any and all documents containing design and technical information, engineering or production data, drawings, plans, specifications, techniques, methods, processes, trade secrets, reports, models, market research data, and any and all other material and matter used by or in possession of Licensor and applicable to the design, manufacture, assembly, service and sale of Products as defined hereafter.
>
> . . . .
>
> "Know-how" shall mean the general and specific "knowledge, experiences and information known to the Licensor, not in written or printed form, applicable to the design, manufacture, assembly, service and sale of Products.
>
> . . . .

"Confidential information" shall mean information regarding the development of products or otherwise relating to the business of either party or of a related company, including without limitation Technical Data and Know-how. It shall include any information, of scientific or commercial value, gathered while working within the Licensing Agreement and Management Agreements between the parties and any other agreements entered into between the parties from time to time. Confidential Information shall include all documents prepared by one party after receipt of Confidential Information from the other and which contain or otherwise reflect the Confidential Information. Information shall not be considered confidential nor subject to this Agreement if it can be demonstrated:

(a) To have been rightfully in the possession of the receiving party prior to the date of the disclosure of such information to receiving party by the disclosing party;

(b) To have been in the public domain prior to the date of the disclosure of such information to the receiving party by the disclosing party;

(c) To have become part of the public domain by publication or by any other means except an unauthorized act or omission by the receiving party; or

(d) To have been supplied to the receiving party without restriction by a third party who is under no obligation to the disclosing party to maintain such information in confidence.

. . . .

Each party agrees to hold all Confidential Information of the other in confidence, and shall take all necessary care to maintain the confidentiality of such other's Confidential Information. Each party shall restrict the number of employees having access to the Confidential Information to those directly connected with the Products or those who otherwise need to know the Confidential Information. Except as otherwise provided herein, neither party shall use any of the Confidential Information made available

to it by the other for any purpose other than as contemplated by this Agreement without the prior written consent of the other.

As stated earlier, VHSC was formed on April 28, 2011, just a few days prior to the scheduled foreclosure sale of EMC Products' assets. At the May 3, 2011 foreclosure sale, VHSC acquired EMC Products' assets. On May 5, 2011, Pike resigned from EMC Products and immediately went to work for VHSC as its president. The following day, VHSC filed a patent application naming Pike as the sole inventor. Testimony revealed that the substance of the patent application was based on Ronin and EMC Cement's technology and trade secrets. Even Pike admitted at trial that he gave VHSC highly-sensitive trade-secret information from EMC Cement. Pike further acknowledged that he filed the patent application containing trade-secret information because he was upset with Lygren and Ronin.

Pike later testified that Preston approached him the day after the foreclosure sale and suggested that he apply for a patent for EMC Products' technology and information and assign the patent to VHSC. Pike gathered "a stack" of material containing information that he and Ronin had spent eighteen months preparing and faxed the information to VHSC's patent attorney on May 5, 2011. A day later, VHSC filed the patent application with twenty-five patent claims. In support of their contention that VHSC interfered with Pike's Management Agreement by inducing Pike to divulge confidential trade-secret information obtained from EMC Products prior to the May 3, 2011 foreclosure sale, appellees asked Ronin, the owner of twenty-seven patents, how long the

Pike, et al. v. Tex. EMC Mgmt., LLC, et al. Page 27

process is for filing a patent. Ronin responded, "[u]sually takes—if you're really focused on that, between four and six weeks when you have all experimental data."

Based on the foregoing, and viewing the evidence in the light most favorable to the jury's verdict, we conclude that a rational factfinder could conclude that Pike breached the Management Agreement by providing VHSC with trade-secret information obtained during his employment with EMC Products.[6] Accordingly, we hold that the evidence supporting the jury's finding that Pike breached the Management Agreement is legally sufficient. *See Reyes*, 272 S.W.3d at 592; *City of Keller*, 168 S.W.3d at 822; *see also Runge*, 57 S.W.3d at 565. Additionally, we cannot say that the jury's verdict as to this claim is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176. Thus, we further conclude that the jury's finding as to this claim is supported by factually-sufficient evidence. *See id.*

However, our analysis of this issue does not stop there. VHSC also challenges the jury's tortious-interference finding, asserting four arguments: (1) EMC Products lacks standing to assert the tortious-interference claim because it currently has no interest in the Management Agreement; (2) VHSC could not interfere with the Management Agreement because VHSC acquired EMC Products' assets in the foreclosure sale; (3)

---

[6] Pike also makes a standing argument in this issue, which hinges on the assumption that the breach transpired after the foreclosure sale. However, we reject this argument because we conclude that the jury could have determined that the breach of the Management Agreement transpired prior to the foreclosure sale. Accordingly, appellees had a "justiciable interest" in the outcome at the time the breach occurred. *See Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 848 (Tex. 2005).

VHSC had a license to use the confidential information; and (4) VHSC's actions were justified because it acquired the License and Management Agreements in the foreclosure sale. Each of these arguments is premised on a faulty assumption—that appellees' tortious-interference claim is based on events that occurred after the May 3, 2011 foreclosure sale. In Question No. 8 of the charge, the jury was asked: "Did VHSC intentionally interfere with Pike's Management Agreement prior to May 4, 2011?" The jury answered Question No. 8 in the affirmative. And based on the evidence outlined above with respect to Pike's Management Agreement, a rational factfinder could have concluded that VHSC induced Pike to share EMC Cement's confidential information— an act that was prohibited by Pike's Management Agreement—long before the foreclosure sale for purposes of filing the patent application and to produce and market VHSC cement. We therefore conclude that the evidence contains legally- and factually-sufficient evidence to support the jury's finding that VHSC tortiously interfered with Pike's Management Agreement. *See Prudential Ins. Co. of Am.*, 29 S.W.3d at 77; *see also Reyes*, 272 S.W.3d at 592; *City of Keller*, 168 S.W.3d at 822; *Cain*, 709 S.W.2d at 176.

And finally, VHSC and Pike also challenge the jury's conspiracy finding. While we agree that Pike cannot be liable for interfering with his own Management Agreement, *see, e.g., In re Vesta Ins. Group, Inc.*, 192 S.W.3d 759, 761 (Tex. 2006), we note that we have already determined that legally- and factually-sufficient evidence supports the jury's finding that VHSC and Pike misappropriated EMC Cement's trade secrets and that

VHSC tortiously interfered with Pike's Management Agreement. Thus, VHSC and Pike's liability is not based on the jury's conspiracy finding, but on findings of direct liability. Nevertheless, throughout this memorandum opinion, we document VHSC and Pike's involvement in the conspiracy to default on EMC Products' loans, sell EMC Products' assets at a foreclosure sale, and form a new company, VHSC, using the trade-secret information and technology obtained from EMC Cement.

As stated earlier, "once a civil conspiracy is found, each co-conspirator is responsible for the action of any of the co-conspirators which is in furtherance of the unlawful combination." *Akin*, 661 S.W.2d at 921; *see Carroll*, 592 S.W.2d at 926. Additionally, because we have upheld the jury's conspiracy finding, all co-conspirators are jointly and severally liable for actual damages resulting from acts in furtherance of the conspiracy. *See Carroll*, 592 S.W.2d at 925-26; *Sandt*, 401 S.W.3d at 220 ("The concept of civil conspiracy is sometimes used by a plaintiff as a basis for establishing joint and several liability among several defendants, some of whom may not have committed a tort by their own conduct."); *Moody*, 161 S.W.3d at 90. Accordingly, we conclude that the jury's conspiracy finding against VHSC and Pike is supported by legally- and factually-sufficient evidence. *See Akin*, 661 S.W.2d at 921; *Carroll*, 592 S.W.2d at 296; *Sandt*, 401 S.W.3d at 220; *Moody*, 161 S.W.3d at 90; *see also Reyes*, 272 S.W.3d at 592; *City of Keller*, 168 S.W.3d at 822; *Cain*, 709 S.W.2d at 176. We therefore overrule VHSC and Pike's second issue.

## VII. THE DAMAGES & ATTORNEY'S FEES AWARDS[7]

In their third through fifth issues, VHSC and Pike make numerous challenges to the damages award. Specifically, they assert that the evidence supporting the damages award is conclusory and speculative and, thus, is not sufficient. Additionally, they contend that appellees' damage model is not competent evidence; the record contains no evidence of "costs saved" damages; the trial court's judgment improperly allowed appellees to recover multiple times for the same injury; and that the trial court's judgment incorrectly calculated the deficiency judgment. Moreover, in their first issue, Walker, Wilson, and Few Ready Mix join in the arguments made by VHSC and Pike and also assert that appellees' damage model is not a proper "lost profits" or "market value" model; that appellees' expert opinions are mixed with fact and fiction and cannot support the damages award; and that EMC Cement cannot recover under a damage model that is

---

[7] On appeal, appellees argued that any damages complaints were waived pursuant to *Coastal Transport Co. v. Crown Central Petroleum Corp.*, 136 S.W.3d 227 (Tex. 2004) and *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402 (Tex. 1998)—which the former held that an objection is required to challenge expert testimony on the basis of underlying methodology, technique, or foundational data used by the witness. However, recent commentators have noted the following:

> At the time *Coastal Transport* exception may have been viewed as a narrow one. But in subsequent cases, the Court has defined "conclusory" and "speculative" to incorporate a broad array of reliability challenges, and as a result, the *Coastal Transport* exception to *Maritime Overseas*'s objection requirement has nearly swallowed the rule. Thus, in Texas, appellate challenges to expert evidence are routinely raised and decided under a legal-sufficiency rubric, not the admissibility rubric.

Harvey Brown & Melissa Davis, *Eight Gates for Expert Witnesses: Fifteen Years Later*, 52 HOUS. L. REV. 1, 46-47 (2014); *see generally Houston Unlimited, Inc. v. Mel Acres Ranch*, 443 S.W.3d 820 (Tex. 2014); *City of San Antonio v. Pollock*, 284 S.W.3d 809 (Tex. 2009). Therefore, despite the fact that appellants did not object in the trial court regarding damages, given the trend of allowing parties to challenge expert-witness testimony under the legal-sufficiency rubric, we will address appellants' damages complaints in this appeal.

premised on the diminished value of a partnership interest.  Walker, Wilson, and Few

Ready Mix also challenge the attorney's fees award.

## A.      Modification of the Amended Final Judgment

The Amended Final Judgment awarded the following damages:

- For misappropriation of trade secrets and conspiracy, the trial court awarded EMC Cement $1.5 million from VHSC, Pike, Walker, Wilson, and Few Ready Mix, jointly and severally, as well as pre- and post-judgment interest.

- For tortious interference with Pike's Management Agreement, the trial court awarded EMC Products $7 million from VHSC, Pike, Walker, Wilson, and Few Ready Mix, jointly and severally, as well as pre- and post-judgment interest.

- For breach of the Management Agreement, the trial court awarded EMC Products $1 million from Pike, as well as pre- and post-judgment interest.

- For breach of the Partnership Agreement, the trial court awarded EMC Cement $7 million from Walker and Wilson, jointly and severally, as well as pre- and post-judgment interest.

- Additionally, the trial court awarded EMC Cement $580,000 in attorney's fees from Walker and Wilson, as well as attorney's fees for appeals to this Court and the Texas Supreme Court.

At the outset of our analysis, we note that appellees have conceded that Pike

cannot be liable for intentionally interfering with his own contract—the Management

Agreement.  *See In re Vesta Ins. Group, Inc.*, 192 S.W.3d at 761 ("The obligation not to

interfere with existing contracts is a general obligation imposed by law.  But it is *not*

imposed on the parties to that contract, as 'a party cannot tortiously interfere with its own

contract.'" (quoting *Holloway v. Skinner*, 898 S.W.2d 793, 796 (Tex. 1995)) (emphasis in

original)).  As such, the Amended Final Judgment should be modified to remove Pike's liability for the tortious-interference-with-the-Management-Agreement claim.

## B. Applicable Law

We now endeavor to analyze the remaining damage awards.  "In determining damages, the jury has discretion to award damages within the range of evidence presented at trial."  *Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002) (citing *Price Pfister, Inc. v. Moore & Kimmey, Inc.*, 48 S.W.3d 341, 352 (Tex. App.—Houston [14th Dist.] 2001, pet. denied)).  Lost profits must be shown by competent evidence with reasonable certainty.  *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 504 (Tex. 2001).  At a minimum, opinions or estimates of lost profits "must be based on objective facts, figures, or data from which the lost-profits amount may be ascertained."  *Id.*  In most instances, when conducting a lost-profit analysis, you look to past profits and adjust these numbers based on the surrounding circumstances to determine what the lost profit for a certain time period should be.  *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994).

However, where no history of relevant past profits exists, such as the case here, a historically-unprofitable business must produce "some other objective data, such as future contracts, from which lost profits can be calculated with reasonable certainty."  *Helena Chem. Co.*, 47 S.W.3d at 505.  "Revenue forecasting[,] as in a lost[-]income analysis[,] must be based on objective facts or data and established to a reasonable

certainty." *M&A Tech., Inc. v. iValue Group, Inc.*, 295 S.W.3d 356, 366 (Tex. App.—El Paso 2009, pet. denied) (citing *Helena Chem Co.*, 47 S.W.3d at 505).

"When an expert opinion is admitted into evidence without objection, 'it may be considered probative evidence even if the basis for the opinion is unreliable.'" *Houston Unlimited, Inc. v. Mel Acres Ranch*, 443 S.W.3d 820, 829 (Tex. 2014) (quoting *City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009)). "'But if no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection.'" *Id.* (citing *Pollock*, 284 S.W.3d at 818). "This is because the evidentiary value of expert testimony is derived from its basis, not from the mere fact that the expert has said it." *Id.* (citations omitted).

## C. Discussion

On appeal, many of appellants' arguments on damages center on the proposition that Lygren's opinion is unreliable and suffers from analytical gaps because it is allegedly based on speculation and improper data. In particular, appellants challenge Lygren's assumption of a 19% annual growth rate through 2021, Miller's assumption of an 11-18% annual growth rate through 2018, and projections of rising sales prices and volumes, despite EMC Products' track record of unprofitability.

Expert testimony is unreliable if "there is simply too great an analytical gap between the data [relied upon] and the opinion proffered." *Gammill v. Jack Williams*

*Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998) (internal citations omitted). An expert must "connect the data relied on and his or her opinion" and "show how that data is valid support for the opinion reached." *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 642 (Tex. 2009) (citing *Pollock*, 284 S.W.3d at 819-20; *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 906 (Tex. 2004); *Gammill*, 972 S.W.2d at 726). "We are not required . . . to ignore fatal gaps in an expert's analysis or assertions that are simply incorrect." *Volkswagen of Am., Inc.*, 159 S.W.3d at 912. "A flaw in the expert's reasoning from the data may render reliance on a study unreasonable and render the differences drawn therefrom dubious. Under that circumstance, the expert's scientific testimony is unreliable and, legally, no evidence." *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997).

## 1. Lygren's Testimony About the Value of EMC Products

At trial, Lygren testified that the value of the Texas EMC business related to the Jewett plant, including EMC technology was "about $12 million, excluding the value of the plant itself" before the foreclosure sale. After the foreclosure sale, the business was valued at zero. Later, Lygren stated that the value of the plant as carried on the books of EMC Products as of March 2011 was "about $4 million." Lygren purportedly arrived at these values based on two theories: (1) a comparison of EMC Products' operation in Texas to the proposed partnership with C-Change in California; and (2) EMC Products' financial records from 2006-2010, Pike's projections about future growth, historical records of cement sales in Texas, and generally-accepted accounting methods.

Lygren's assessment that the business had fair-market value of $12 million prior to the foreclosure sale was based on an evaluation of EMC Products' projected EBITDA[8] for the years 2011 through 2020. Lygren, an individual with a Bachelor of Science in Business from the Norwegian School of Business and over forty years' of experience in business, testified that EBITDA is recognized and commonly used for assessing the value of a business. Appellants' damages expert, Todd Burchett, agreed that an EBITDA-based analysis is an acceptable valuation methodology, though he asserted that the methodology was not properly applied in this case.

In any event, Lygren noted that he arrived at his valuation by considering the following: (1) EMC Products' financial statements from 2006-10, which notably reflected positive EBITDA figures; (2) Federal Accounting Standards and Procedures; (3) International Private Equity Fund and Venture Capital Guidelines; (4) Pike's projections for EMC Products' earnings and expenses for 2011; (5) American Coal Ash Association reports on consumption and production of fly ash in the United States; (6) United States Geological Survey reports on cement consumption in Texas; and (7) deposition testimony of Walker. Using this information, Lygren made the following determinations: (1) the amount of Portland Cement that was sold in Texas from 2005-2012; (2) the market potential for CemPozz, a substitute product for Portland Cement; (3) market penetration

---

[8] EBITDA is described as the business's earnings before interest, tax, depreciation, and amortization.

for CemPozz from 2005-2010, which Lygren characterized as having "significant upside potential"; (4) EMC Products' average EBITDA from 2006-2010 as $458,003;[9] (5) the volume of products EMC Products would have sold in 2011 (86,273 tons); (6) the price per ton sale price EMC Products would have received in 2011 ($52.97), based on sales prices from 2006-10; (7) cost of goods sold per ton for 2011 ($34.52), based on costs from 2006-10; and (8) administrative, sales, and marketing costs for 2011, based on Pike's estimates ($573,328 for general administrative expenses and $199,291 for sales and marketing). Using these figures, Lygren extrapolated that EMC Products would have had an EBITDA of $819,083 for 2011. When using a 20% inflation rate to discount cash flows over a nine-year period, Lygren calculated the net present value of the EBITDA of 2011 to be $682,569.

Next, Lygren projected a 19% annual increase in sales volume from 2012 through 2020. This projection was based on a 48% increase in sales volume that Pike estimated for 2011 over 2010 and EMC Products' historical market penetration, which was small at the time of the foreclosure sale. Additionally, Lygren projected the selling price per ton that EMC Products would receive for sales from 2012 through 2020, based on prices from 2005 to 2010. The price projections increased from $55.26 per ton in 2012 to $73.61 per ton in 2020. Lygren did the same for cost of goods sold and administrative, sales, and

---

[9] Lygren recounted that EMC Products' EBITDA for 2006-10 was as follows: (1) $506,149 for 2006; (2) $745,071 for 2007; (3) $389,914 for 2008; (4) $461,499 for 2009; and (5) $187,308 for 2010.

marketing costs for 2012 through 2020. With respect to administrative, sales, and marketing costs, Lygren applied a 1.5% inflation rate. From these figures, Lygren derived a yearly EBITDA for 2012 through 2020, and after applying the previously-mentioned 20% discount rate, Lygren determined the present value of the EBITDA figures for 2012 through 2020.

Based on the foregoing testimony, we cannot say that Lygren's testimony was unreliable on its face. *See Beaumont v. Basham*, 205 S.W.3d 608, 621 (Tex. App.—Waco 2006, pet. denied) (concluding that an expert opinion was not speculative or conclusory because it was based on billing records and personal knowledge); *Durham Transp. Co. v. Beettner*, 201 S.W.3d 859, 868 n.5 (Tex. App.—Waco 2006, pet. denied) ("Here, the orthopedic surgeon based her opinions on her 2 physical examinations of Thomas, Thomas's reports of her symptoms and medical history, CT scans, x-rays, and Thomas's progress in physical therapy. Accordingly, we reject Durham's contention that the surgeon's testimony on its face is conclusory or speculative."); *see also Lockhart v. McCurley*, No. 10-11-00073-CV, 2013 Tex. App. LEXIS 4075, at **30-31 (Tex. App.—Waco Mar. 28, 2013, no pet.) (mem. op.) (holding that an expert opinion regarding the value of a business was not speculative or conclusory because the expert explained the data he relied on and his methodology). In fact, Lygren's testimony was based on widely-accepted valuation methodology and was supported by data, including government records, EMC Products' financial records, and Pike's own estimate of EMC Products'

future sales and expenses. Given the number of sources Lygren relied upon and Lygren's

extensive testimony explaining how he arrived at his valuation, we do not believe that

Lygren's testimony about the valuation of the business constituted ipse dixit. *See Earle v.*

*Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999) ("An expert's simply *ipse dixit* is insufficient to

establish a matter; rather, the expert must explain the basis of his statements to link his

conclusions to the facts." (emphasis in original)); *see also Natural Gas Pipeline Co. of Am. v.*

*Justiss*, 397 S.W.3d 150, 156 (Tex. 2012) ("'If an expert br[ings] to court little more than his

credentials and a subjective opinion,' his testimony will not support a judgment."

(quoting *Havner*, 953 S.W.2d at 712)) .

## 2. Testimony About Misappropriation-of-Trade-Secret Damages

Appellants also complain about Lygren's testimony regarding damages sustained

for misappropriation of trade secrets.

> Damages in trade secret cases can take a variety of forms. The variety of
> approaches demonstrates the flexible and imaginative methods employed.
> The methods used to calculate damages include the value of the plaintiff's
> lost profits; the defendant's actual profits from the use of the secret; the
> value that a reasonably prudent investor would have paid for the trade
> secret; the development costs the defendant avoided by the
> misappropriation; and a "reasonable royalty." Courts adjust the measure
> of damages to accord with the commercial setting of the injury, the likely
> future consequences of the misappropriation, and the nature and extent of
> the defendant's use of the trade secret. Each case is controlled by its own
> peculiar facts and circumstances.

*Sw. Energy Prod. Co.*, 411 S.W.3d at 608-09 (internal citations & quotations omitted).

> The law does not require absolute certainty as to the amount of lost profit.
> While damages may not be determined by mere speculation or guess, it will

be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.

*Downtown Realty, Inc. v. 509 Tremont Bldg., Inc.*, 748 S.W.2d 309, 313 (Tex. App.—Houston [14th Dist.] 1988, no writ); *see Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994) (per curiam); *see also Wellogix, Inc. v. Accenture, L.L.P.*, No. 11-20816, 2013 U.S. App. LEXIS 25944, at **22-27 (5th Cir. May 15, 2013).

In the instant case, the jury was tasked with determining EMC Cement's trade-secret damages based on "the costs saved by VHSC as a result of its use . . . of the Trade Secrets in Texas" and the value of the use of the trade secrets to a reasonably-prudent investor. The record evidence reflects that EMC Cement's technology and trade secrets were developed for many years at a cost of millions of dollars. Lygren noted that he personally invested $20 million in the development of technology that ultimately resulted in the CemPozz and PozzoSlag products.

Presumably, VHSC saved some on development costs, especially given that we have affirmed VHSC's liability under appellees' misappropriation-of-trade-secrets claim. However, appellees do not direct us to record evidence reflecting the amount of development costs saved by VHSC as a result of the misappropriation. Lygren's testimony about his personal investment in the entire EMC business is not enough to support the jury's conclusion that VHSC saved $1.5 million in development costs as a result of the misappropriation of EMC Cement's trade secrets. *See Houston Mercantile Exch. Corp. v. Dailey Petroleum Corp.*, 930 S.W.2d 242, 248 (Tex. App.—Houston [14th Dist.]

1996, no writ) (finding that, as a threshold requirement to recovering damages in trade-secret and unfair-competition claims, "a plaintiff must produce evidence from which the jury may reasonably infer that the damages sued for have resulted from the conduct of the defendant."). Lygren's personal investment could have been used to finance other business expenses across EMC's entire business enterprise just as easily as it could have been used to finance trade-secret technology. *See MGE UPS Sys. v. GE Consumer & Indus., Inc.*, 622 F.3d 361, 369 (5th Cir. 2010) (applying Texas law, and finding no evidence of trade-secret damages where "MGE has not presented evidence that provides any means of distinguishing revenue PMI gained from other sources from revenue gained through misappropriation of MGE's trade secrets, let alone a calculation of profits from the relevant portion of revenue") And though damages in trade-secret cases can be flexible and imaginative, appellees have not proffered sufficient evidence for the jury to have made a just and reasonable inference regarding development costs saved by VHSC. *See Szczepanik*, 883 S.W.2d at 649; *Sw. Energy Prod. Co.*, 411 S.W.3d at 608-09; *Houston Mercantile Exch. Corp.*, 930 S.W.2d at 248; *Downtown Realty, Inc.*, 748 S.W.2d at 313; *see also Wellogix, Inc.*, 2013 U.S. App. LEXIS 25944, at **22-27. Instead, the jury was left to speculate or guess about the amount VHSC saved in development costs based on the misappropriation of EMC Cement's trade secrets, which does not constitute legally-

sufficient evidence.[10]   *See Downtown Realty, Inc.*, 748 S.W.2d at 313; *see also Reyes*, 272 S.W.3d at 592; *City of Keller*, 168 S.W.3d at 822.

### 3.      Paula's Miller's Expert Testimony

Appellees also presented the testimony of Paula Miller, by deposition, regarding the value of EMC Products.  Miller is a financial consultant with an MBA in finance and a Master of Science in accounting.  Previously, Miller worked for Coopers & Lybrand and has had her own consulting firm since 1996.  In her deposition testimony, Miller reviewed EMC Products' balance sheets, profit-and-loss statements, and EBITDA statements from 2003 through March of 2011.  Miller asserted that she applied general business valuation standards of the American Society of Appraisers and the American Institute of Certified Public Accountants in arriving at her valuation of the business.  Miller recounted that she used the EBITDA figures from 2006 through March of 2011 to forecast future earnings

---

[10] However, despite our conclusion that the damage theory based on the development costs saved by VHSC is not supported by legally-sufficient evidence, we can still affirm the $1.5 million award for misappropriation of trade secrets.  In the charge, the jury was asked to calculate damages for misappropriation of trade secrets based on:  (1) the value that a reasonably prudent investor would have paid for use of the trade secrets in Texas; and (2) development costs saved by VHSC.  In its order granting, in part, appellants' motion for JNOV, the trial court set aside the jury's $1.5 million award with respect to the value a reasonably prudent investor would have paid for use of the trade secrets in Texas.  We believe that the trial court erred in setting aside that finding.  *See* TEX. R. CIV. P. 301; *see also Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009); *Brown v. Bank of Galveston*, 963 S.W.2d 511, 513 (Tex. 1998).  Instead, as shown above, the trial court should have set aside the finding premised on development costs saved.  Because the trial court erred, we reverse the portion of the JNOV setting aside the jury's finding in Question 2(a) of the jury charge and reinstate that finding as support for appellees' misappropriation-of-trade-secrets claim.  *See John Masek Corp. v. Davis*, 848 S.W.2d 170, 173 (Tex. App.—Houston [1st Dist.] 1992, writ denied) (noting that if there is more than a scintilla of competent evidence to support the jury's findings, the JNOV will be reversed) *(citing Navarette v. Temple Indep. Sch. Dist.*, 706 S.W.2d 308, 309 (Tex. 1986)).

based on a seven-year business cycle and determined that the fair market value of EMC Products in May 2011 was approximately $5.3 million, not including plant and equipment.

As was the case with Lygren, appellants challenge Miller's testimony on the ground that it is unreliable because it is based on faulty data. And similar to Lygren, appellants did not raise this challenge during trial or when either Lygren or Miller testified. Nevertheless, like Lygren, we cannot say that Miller's testimony was unreliable on its face. *See Beaumont*, 205 S.W.3d at 621; *Durham Transp. Co.*, 201 S.W.3d at 868 n.5; *see also Lockhart*, 2013 Tex. App. LEXIS 4075, at **30-31. Miller's testimony was based on widely-accepted EBITDA-valuation methodology and was supported by data, including EMC Products' financial records. Furthermore, Miller linked the basis of her testimony with her conclusions about the value of the business. We therefore cannot say that Miller's testimony was founded on unsupported assumptions and, thus, incompetent. *See Earle*, 998 S.W.2d at 890; *see also Justiss*, 397 S.W.3d at 156; *Havner*, 953 S.W.2d at 712.

### 4. Harry Swanstrom's Testimony

The record reflects that Harry Swanstrom and his company, Swanstrom Engineering, designed, built, and acquired equipment for EMC Products' plant in 2003. Swanstrom continued to work on the plant through at least 2005. At trial, Swanstrom testified that the value of the plant and equipment was $4.1 million in May 2011, when

the foreclosure sale took place—a figure roughly 75% of the price VHSC paid for EMC Products' assets at a foreclosure sale.

On appeal, appellant challenge Swanstrom's testimony on two grounds: (1) his method; and (2) the reliability of his evidence. Specifically, with respect to Swanstrom's method, appellants contend that he improperly used the replacement value of the equipment as a basis for his opinion.

"Fair market value has been defined as 'the price which the property would bring when it is offered for sale by one who desires, but is not obliged to sell, and is bought by one who is under no necessity of buying it.'" *Burns v. Rochon*, 190 S.W.3d 263, 270 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (quoting *City of Austin v. Cannizzo*, 153 Tex. 324, 267 S.W.2d 808, 815 (1954)). However, when property has no readily ascertainable fair market value, "the measure of damages is the actual value of the property to the owner at the time of its loss." *Id.* (citing *Crisp v. Sec. Nat'l Ins. Co.*, 369 S.W.2d 326 (Tex. 1963)). "The actual value measure of damages has frequently been employed in cases of conversion involving furniture and equipment used in the operation of restaurants and bars." *Id.* (citations omitted).

> In determining both fair market value and actual value, courts have considered the purchase price paid by an owner, particularly when evidence of the purchase price is neither objected to nor controverted. See *Wutke v. Yolton*, 71 S.W.2d 549, 552 (Tex. Civ. App.—Beaumont 1934, writ ref'd) (holding that purchase price is probative of actual value); *San Antonio Pub. Serv. Co. v. Murray*, 59 S.W.2d 851, 854 (Tex. Civ. App.—Beaumont 1933) (holding that purchase price is probative of fair market value when it is the only evidence admitted regarding value and its admission is not

objected to). No matter what measure of damages is employed in establishing the value of the converted property, "it is well settled that the owner of property can testify as to his opinion regarding the value of his own property . . . even if the owner's testimony is halting and indefinite it nonetheless will be sufficient to sustain a verdict when there is no controverting evidence." *Espinosa v. Schomberg*, 601 S.W.2d 161, 164 (Tex. Civ. App.—Waco 1980, writ ref'd n.r.e.).

*Id.* at 270-71.

Here, Swanstrom testified that there was no way to establish a fair market value for the used equipment in the facility. Accordingly, he based his opinion on the purchase price of the equipment, plus a 20% escalation factor that he applied based on his experience in pricing equipment. This testimony was offered without objection, and it was unrebutted. Therefore, in light of *Burns* and other case law cited above, we cannot say that the measure of damages used by Swanstrom was improper. *See id.* at 270-71; *see also Yolton*, 71 S.W.2d at 552; *Murray*, 59 S.W.2d at 854.

Additionally, appellants contend that Swanstrom's testimony was unreliable. We reject this argument as the record indicates that Swanstrom based his testimony on his experience both in pricing equipment and as the designer and builder of the plant equipment involved in this case. Thus, we conclude that Swanstrom sufficiently linked his testimony with his conclusions regarding the value of the plant equipment. *See Earle*, 998 S.W.2d at 890; *see also Justiss*, 397 S.W.3d at 156; *Havner*, 953 S.W.2d at 712.

### 5. The One-Satisfaction Rule

Under Texas law, "[t]here can be but one recovery for one injury, and the fact that more than one defendant may have caused the injury or that there may be more than one theory of liability, does not modify this rule." *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 8 (Tex. 1991); *see Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 303 (Tex. 2006). However, "a 'jury's award is not duplicative simply because it allocated damages under two distinct causes of action." *Aspen Tech., Inc. v. M3 Tech, Inc.*, 569 F. App'x 259, 271 (5th Cir. 2014) (not designated for publication) (quoting *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 497 (2d Cir. 1995)); *see DSC Comm'cns Corp. v. Next Level Comm'cns*, 107 F.3d 322, 330 (5th Cir. 1997) ("The damage model Sears presented showed the total damages allocated to Next Level's alleged wrongful conduct. The jury then allocated damages to each different cause of action. DSC was not obligated to precisely apportion damages for each instance of wrongful conduct it alleged, as unitary damages models are permissible under Texas law." (citing *Bildon Farms, Inc. v. Ward County Improvement Dist., No. 2*, 415 S.W.2d 890, 896 (Tex. 1967))). In other words, "a court may rationally conclude that the jury found that the plaintiff suffered that amount of injuries and 'merely allocated that amount between the two different causes of action." *Aspen Tech., Inc.*, 569 F. App'x at 271 (citing *Indu Craft, Inc.*, 47 F.3d at 497).

Here, the Amended Final Judgment awarded, among other things, $7 million to EMC Products on the claim involving tortious interference with Pike's Management Agreement; $7 million to EMC Cement for the claim of breach of the Partnership

Agreement; and $1 million to EMC Products for the breach of the Management Agreement claim. These figures were based on the aforementioned unchallenged testimony regarding the value of the EMC Products business and assets at the time of the foreclosure sale. And based on the foregoing case law, and our affirmance of appellants' underlying liability, the jury was entitled to allocate the damages between the three causes of action without violating the one-satisfaction rule. *See Aspen Tech, Inc.*, 569 F. App'x at 271; *DSC Comm'cns Corp.*, 107 F.3d at 330; *Indu Craft, Inc.*, 47 F.3d at 497; *see also Bildon Farms, Inc.*, 415 S.W.2d at 896.

### 6. Attorney's Fees

Next, Walker, Wilson, and Few Ready Mix challenge the attorney's fees award, arguing that the trial court should not have granted the fees because billing records were not produced until trial; there was no proof of presentment; the fees were not segregated; and the only support for the award was the breach-of-the-Partnership-Agreement claim, which Walker, Wilson, and Few Ready Mix contend should be reversed and rendered.

At the outset, we reject the argument that the attorney's fees award should be reversed based on the breach-of-the-Partnership-Agreement claim. Earlier, we held that the evidence supporting that claim is sufficient. Furthermore, Walker, Wilson, and Few Ready Mix have not provided any citations to case law or the record to support this argument. *See* TEX. R. APP. P. 38.1(i).

Walker, Wilson, and Few Ready Mix also complain that the billing records were not produced at trial. Essentially, Walker, Wilson, and Few Ready Mix contend that the trial court abused its discretion in admitting the billing records at trial. We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *See City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995); *see also Cady v. Cargile*, No. 10-13-00026-CV, 2015 Tex. App. LEXIS 4501, at *9 (Tex. App.—Waco Apr. 30, 2015, no pet.) (mem. op.) (citing *Bay Area Healthcare Group, Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007)). A trial court exceeds its discretion if it acts in an arbitrary or unreasonable manner or without reference to guiding rules or principles. *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). When reviewing matters committed to the trial court's discretion, we may not substitute our own judgment for the trial court's judgment. *Id.* And we must uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

At the hearing on attorney's fees, counsel for Walker, Wilson, and Few Ready Mix argued that requests for production were propounded, but records of fee billings were not produced until well into trial on April 30, 2011. Counsel for appellees explained the numbers of hours spent by counsel in this trial and that a lot of effort was made to get up to speed on this case both before and after trial days. Counsel further asserted that "it takes more time to represent the plaintiff than it does to represent the defendant. . . . But

the time that I testified to was time that was actually spent." The trial court took the matter under advisement, but eventually admitted the fee records into evidence.

Texas Rule of Civil Procedure 193.6(a) provides that a party who fails to make, amend, or supplement a discovery response in a timely manner may not introduce the untimely information in evidence unless the court finds good cause or no unfair surprise or prejudice to the other parties. *See* TEX. R. CIV. P. 193.6(a). On appeal, Walker, Wilson, and Few Ready Mix do not address the exception for unfair surprise or prejudice, but rather focus on good cause. Given that counsel for appellees explained that the fees corresponded with work associated with trial—largely an event attended by all parties in this case, we cannot say that the record demonstrates a finding of unfair surprise or prejudice. *See id.* at R. 193.6(b). Therefore, we cannot say that the trial court abused its discretion in admitting the billing records. *See McShane*, 239 S.W.3d at 234; *Alvarado*, 897 S.W.2d at 753; *see also Cady*, 2015 Tex. App. LEXIS 4501, at *9.

Walker, Wilson, and Few Ready Mix also complain that appellees did not properly present the underlying claim. To recover attorney's fees under Chapter 38 of the Texas Civil Practice and Remedies Code,

(1) the claimant must be represented by an attorney;

(2) the claimant must present the claim to the opposing party or to a duly authorized agent of the opposing party; and

(3) payment for the just amount owed must not have been tendered before the expiration of the 30th day after the claim is presented.

TEX. CIV. PRAC. & REM. CODE. ANN. § 38.002 (West 2015). The purpose of the presentment requirement is to allow the person against whom the claim is asserted an opportunity to pay a claim within thirty days of receiving notice of the claim without incurring an obligation for attorney's fees. *See Jones v. Kelley*, 614 S.W.2d 95, 100 (Tex. 1981). Presentment requires no particular form; all that is necessary is an assertion of a debt or claim, a request for payment, and the opposing party's refusal to pay. *Id.*; *see Standard Constructors, Inc. v. Chevron Chem. Co.*, 101 S.W.3d 619, 627 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). "When the question of attorney's fees is submitted to the court, the court may consider the entire case file to determine whether presentment was made." *Bethel v. Norman Furniture Co.*, 756 S.W.2d 6, 8 (Tex. App.—Houston [1st Dist.] 1988, no writ) (citing *Carrington v. Hart*, 703 S.W.2d 814, 818 (Tex. App.—Austin 1988, no writ)); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 38.004(1) (West 2015).

The claimant bears the burden to plead and prove presentment of its contract claim and that the party failed to tender performance. *See Ellis v. Waldrop*, 656 S.W.2d 902, 905 (Tex. 1983) (op. on reh'g). "But when a claimant avers in its petition that all conditions precedent to recovery have occurred or have been performed, it is required to prove only those conditions precedent that have specifically been denied by the opposing party." *Shin-Con Dev. Corp. v. I.P. Invs., Ltd.*, 270 S.W.3d 759, 768 (Tex. App.—Dallas 2008, pet. denied) (citing TEX. R. CIV. P. 54); *see Belew v. Rector*, 202 S.W.3d 849, 857 (Tex. App.— Eastland 2006, no pet.).

In the instant case, EMC Cement pleaded "[a]ll conditions precedent necessary for the enforcement of the Partnership Agreement, the Management Agreement, and the License Agreement have been satisfied, fulfilled, or excused."  Walker, Wilson, and Few Ready Mix responded "that all conditions precedent necessary for enforcement of the Partnership Agreement have not occurred."  By failing to specifically deny that appellees failed to present their contract claim as required by statute, Walker, Wilson, and Few Ready Mix have waived their right to complain of such failure on appeal.  *See Shin-Con Dev. Corp.*, 270 S.W.3d at 768 (citing *Gill Sav. Ass'n v. Int'l Supply Co., Inc.*, 759 S.W.2d 697, 701 (Tex. App.—Dallas 1988, writ denied)); *see also* TEX. R. CIV. P. 54 ("In pleading the performance or occurrence of conditions precedent, it shall be sufficient to aver generally that all conditions precedent have been performed or have occurred.  When such performance or occurrences have been so plead, the party so pleading same shall be required to prove only such of them as are specifically denied by the opposite party.").

And finally, we address Walker, Wilson, and Few Ready Mix's contention that the attorney's fees should have been segregated.  An appellate court reviews a trial court's decision on the award of attorney's fees for an abuse of discretion.  *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998).  "Whether to award attorney's fees, and to which party, is a decision that is solely within the trial court's discretion and will not be reversed absent a clear abuse of that discretion."  *Sammons v. Elder*, 940 S.W.2d 276, 284 (Tex. App.—Waco 1997, writ denied).

Ordinarily, fees claimants must segregate fees between claims for which they are recoverable and claims for which they are not. *Chapa*, 212 S.W.3d at 311. Moreover, the need to segregate fees is a question of law that appellate courts review de novo. *See id.* at 312. However, a recognized exception to the duty to segregate arises when the attorney's fees rendered are in connection with claims arising out of the same transaction and are so interrelated that their "prosecution or defense entails proof or denial of essentially the same facts." *Sterling*, 822 S.W.2d at 10; *see Ski River Dev., Inc. v. McCalla*, 167 S.W.3d 121, 143 (Tex. App.—Waco 2005, pet. denied). "Therefore, when the causes of action involved in the suit are dependent upon the same set of facts or circumstances and thus are 'intertwined to the point of being inseparable,' the party suing for attorney's fees may recover the entire amount covering all claims." *McCalla*, 167 S.W.3d at 143 (quoting *Sterling*, 822 S.W.2d at 11).

At the hearing on attorney's fees in this case, the trial court heard testimony that appellees' contract claims against Walker and Wilson were too intertwined with the other claims in the case to segregate. The record evidence supports this contention, especially given that Walker and Wilson's breaches of the Partnership Agreement were closely linked with the conspiracy to end the EMC Products partnership and misappropriate EMC Cement's trade secrets for a new competitor in the cement business, VHSC. Accordingly, based on the record before us, we cannot say that the trial court abused its discretion in accepting appellees' testimony that the claims were too intertwined to

segregate and awarding appellees' attorney's-fees request. *See Bocquet*, 972 S.W.2d at 21; *Sterling*, 822 S.W.2d at 10-11; *McCalla*, 167 S.W.3d at 143; *see also Classic Superoof LLC v. Bean*, No. 05-12-00941-CV, 2014 Tex. App. LEXIS 11365, at **23-24 (Tex. App.—Dallas Oct. 14, 2014, pet. denied) (mem. op.) (finding no abuse of discretion where the trial court did not require the segregation of attorney's fees because the testimony established that the claims at issue were inextricably intertwined).

### 7. Walker and Wilson's Monthly Payments to Texas Central Bank

Walker and Wilson also argue that they are entitled to recover sums they "loaned" to EMC Products. Their claim is premised on the jury's award of $250,000 to Walker and Wilson for "unpaid loans made to EMC Products," which they contend omits funds that are still owed. Specifically, Walker and Wilson allege that they should be reimbursed for the $25,000 monthly principal payments made to the bank from July 2009 to December 2010.

At the outset, we note that Walker and Wilson have not cited any authority to support their claim for these amounts. *See* TEX. R. APP. P. 38.1(i). Moreover, under the express terms of the Partnership Agreement, any payments made by Walker and Wilson to the bank as a result of their personal guarantees were deemed to be additional capital contributions to the partnership, rather than loans. Specifically, section 2.6 of the Partnership Agreement provided:

> **Deemed Additional Capital Contributions.** A Partner shall be deemed to have made an additional Capital Contribution to the Partnership if and to

the extent: (i) such Partner makes any payment to a creditor of the Partnership because of personal liability thereon; or (ii) such Partner makes any payment to a creditor of the Partnership because of the personal guarantee by such Partner.

Because Walker and Wilson admitted that they made $25,000 monthly principal payments because of their personal guarantees, and because Walker admitted that he understood the payments to be additional capital contributions under the terms of the Partnership Agreement, we cannot say that it was error to not include the principal payments in the judgment.

### 8. EMC Products' Liability Under the Loan Agreement

In this sub-issue, VHSC contends that EMC Products is liable for the amount allegedly remaining due on the loan. The record reflects that Walker and Wilson wired a combined sum of $3,937,418—the full amount outstanding on the EMC Products loan—to Texas Capital Bank. VHSC asserts that this money was sent on behalf of Few Ready Mix to pay for its acquisition of the loan. VHSC, Pike, Walker, Wilson, and Few Ready Mix moved for judgment notwithstanding the verdict on this complaint.

A trial court may disregard a jury's verdict and render a JNOV if there is no evidence to support the jury's findings or if a directed verdict would have been proper. *Brown v. Bank of Galveston*, 963 S.W.2d 511, 513 (Tex. 1998); *see* TEX. R. CIV. P. 301. We review the trial court's ruling on a motion for JNOV under a legal-sufficiency standard. *See Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009).

Phillip Wood, formerly the Executive Vice President of Texas Capital Bank, testified that, on May 2 and May 3, Walker and Wilson each wired $1,968,709. Wood noted that the beneficiary listed on the document was EMC Products, not the bank. Though Wood believed that the wire transfers were for the purchase of the note, he admitted that there was not any reference to the purchase of the note in bank documents. The bank honored the beneficiary named in the wire transfer and applied the funds to EMC Products' account. The transactions were recorded in the bank ledger, and as a result of the transactions, the principal balance of the note was zero.

Given that bank documents do not reflect a purchase of the note, but rather the paying off of the note, we cannot say that the jury erred in relying on the bank's records in finding that EMC Products complied with the loan agreement. As such, we hold that the trial court did not err in failing to enter judgment notwithstanding the verdict on VHSC's deficiency counterclaim. *See* TEX. R. CIV. P. 301; *see also Tanner*, 289 S.W.3d at 830; *Brown*, 963 S.W.2d at 513.

Based on the foregoing, we overrule VHSC and Pike's third through fifth issues. We also overrule Walker, Wilson, and Few Ready Mix's first issue.

## VIII. PERMANENT INJUNCTION

In their sole issue on cross-appeal, EMC Management, EMC Products, and EMC Cement contend that the trial court abused its discretion in failing to enter a permanent

injunction in their favor, especially considering VHSC and Pike have used and disclosed EMC Cement trade secrets and are in a position to continue to do so.

## A. Applicable Law

Whether to grant a permanent injunction is ordinarily within the sound discretion of the trial court and, on appeal, review of the trial court's action is limited to the question of whether the trial court clearly abused its discretion. *See Noell v. City of Carrollton*, 431 S.W.3d 682, 712 (Tex. App.—Dallas 2014, pet. denied); *see also Devon Energy Prod. Co., L.P. v. McCarver*, No. 10-15-00002-CV, 2015 Tex. App. LEXIS 8241, at *3 (Tex. App.—Waco Aug. 6, 2015, no pet.) (mem. op.). We view the evidence in the light most favorable to the trial court's judgment. *Swate v. Medina Cmty. Hosp.*, 966 S.W.2d 693, 700 (Tex. App.—San Antonio 1998, pet. denied). If some evidence appears in the record that reasonably supports the trial court's decision, there is no abuse of discretion. *Id.* The trial court abuses its discretion only if the record contains no evidence supporting the trial court's findings. *Operation Rescue-Nat'l v. Planned Parenthood of Houston*, 975 S.W.2d 546, 560 (Tex. 1998).

At common law, the applicant seeking injunctive relief must demonstrate: (1) the existence of a wrongful act; (2) the existence of imminent harm; (3) the existence of irreparable injury; and (4) the absence of an adequate remedy at law. *See Noell*, 431 S.W.3d at 712; *see also McCarver*, 2015 Tex. App. LEXIS 8241, at *3. "Without proof of all four elements, injunctive relief is improper." *John Paul Mitchell Sys. v. Randalls Food Mkts.*,

*Inc.*, 17 S.W.3d 721, 732 (Tex. App.—Austin 2000, pet. denied). An injunction will not be issued to prevent injury that is purely conjectural or speculative. *Jordan v. Landry's Seafood Rest., Inc.*, 89 S.W.3d 737, 742 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (op. on reh'g).

**B.      Discussion**

The complaints about the permanent injunction correspond with the misappropriation-of-trade-secrets claim alleged at trial. The trial court made numerous findings of fact and conclusions of law. Ultimately, the trial court concluded that EMC Cement does not face imminent harm based on the following fact findings:

1. VHSC is not currently using any of EMC Cement's claimed trade secrets.

2. VHSC discontinued use of any EMC Cement's claimed trade secrets shortly after the foreclosure sale.

3. Soon after the foreclosure sale, VHSC removed the equipment modifications EMC Cement used to mill cementitious material.

4. Within several weeks of the foreclosure sale, VHSC began using different materials in its milling process, by among other things, substituting lime for Portland Cement.

5. In 2012, VHSC began using entirely different milling equipment that employed a different technique to produce cementitious materials.

And in concluding that EMC Cement did not face imminent harm, the trial court stated that the Amended Final Judgment awarded future damages for the misappropriation of trade secrets; thus, EMC Cement already obtained an adequate legal remedy and is not

entitled to a permanent injunction. Contrary to the assertions of cross-appellees, appellants have challenged the trial court's findings of fact and conclusions of law.

### 1. Existence of a Wrongful Act

As we have concluded earlier, the evidence supporting cross-appellants' misappropriation-of-trade-secrets claim is legally and factually sufficient. As such, cross-appellants have established the first prong for a permanent injunction—a wrongful act.

### 2. Imminent Harm

The next prong—imminent harm—was hotly contested at trial and was the focus of the trial court's findings of fact. On cross-appeal, cross-appellants contend that harm is presumed in a misappropriation-of-trade-secrets case when a defendant possesses trade secrets and is in a position to use them. Cross-appellees, on the other hand, argue that there is no basis for finding imminent harm, especially considering that the trial court, in its findings of fact, stated that VHSC is no longer using the claimed trade secrets. With this prong, we necessarily have to analyze the propriety of the trial court's findings of fact and conclusions of law.

Findings of fact entered in a case tried to the court have the same force and dignity as a jury verdict. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). We thus review findings of fact by the same standards that are applied in reviewing the legal and factual sufficiency of the evidence supporting a jury's answer to a jury question. *Id.* We have already laid out the governing law for legal and factual sufficiency.

The standard of review for conclusions of law is de novo. *See BMC Software Belg.,* *N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). We evaluate the trial court's legal conclusions independently to determine whether the trial court correctly drew the legal conclusions from the facts. *Id.* We uphold conclusions of law on appeal if the judgment can be sustained on any legal theory the evidence supports. *Material P'ships, Inc. v.* *Ventura*, 102 S.W.3d 252, 257 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Thus, incorrect conclusions of law do not require reversal if the controlling findings of fact support the judgment under a correct legal theory. *Id.*

At trial, Pike admitted that VHSC was using EMC Cement trade secrets, including the VBMs, in May 2013, or, in other words, two years after the foreclosure sale. Additionally, immediately after the foreclosure sale, VHSC sold the same PozzoSlag product that EMC Products had developed, and testimony at trial revealed that VHSC was still selling PozzoSlag at the time of trial. Finally, the evidence indicated that Pike worked with Ronin to develop processes for using Rotary Ball Mills to manufacture energetically-modified cement, and at the time of trial, VHSC was using this same technology to manufacture PozzoSlag.

In light of this unchallenged evidence, it is our belief that a reasonable factfinder could not have concluded that VHSC stopped using EMC Cement trade secrets shortly after the foreclosure sale. Additionally, a reasonable factfinder could have concluded that VHSC was using EMC Cement trade secrets at the time the permanent injunction

was denied. As such, we conclude that the trial court's findings of fact regarding VHSC's usage of EMC Cement's trade secrets are not supported by legally-sufficient evidence. And given that the underlying fact findings are not supported by legally-sufficient evidence, we must reverse the trial court's conclusion of law that EMC Cement did not face imminent harm.[11]

And despite the fact that the trial court's findings of fact and conclusions of law pertaining to imminent harm are not supported by sufficient evidence, we also agree with cross-appellants' contention that when a defendant possesses trade secrets and is in a position to use them, harm is presumed. *See IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 200 (Tex. App.—Fort Worth 2005, no pet.) ("When a defendant possesses trade secrets and is in a position to use them, harm to the trade secret owner may be presumed" (citing *Fox v. Tropical Warehouses, Inc.*, 121 S.W.3d 853, 860 (Tex. App.—Fort Worth 2003, no pet.))); *T-N-T Motorsports, Inc. v. Hennessey Motorsports*, 965 S.W.2d 18, 24 (Tex. App.—Houston [1st Dist.] 1998, no pet.) (holding that because appellant possesses confidential information and was in a position to use it, appellant was likely to use the information to the former employer's detriment); *see also Hill v. McLane Co.*, No. 03-10-

---

[11] Not only is the trial court's conclusion of law regarding imminent harm erroneous based on the insufficiency of the underlying findings of fact, but the assumption that the Amended Final Judgment awarded future damages to EMC Cement and was an adequate legal remedy is incorrect. In fact, as stated earlier in this memorandum opinion, the jury was asked two damages questions with respect to the misappropriation-of-trade-secrets claim. Both of the questions asked about past damages—namely, what a reasonably prudent investor would have paid for use of EMC Cement's trade secrets in Texas and what development costs were saved by VHSC.

00293-CV, 2011 Tex. App. LEXIS 169, at *14 (Tex. App.—Austin Jan. 5, 2011, no pet.) (mem. op.); *Lockhart v. McCurley*, No. 10-09-00240-CV, 2010 Tex. App. LEXIS 1909, at *14 (Tex. App.—Waco Mar. 10, 2010, no pet.) (mem. op.) ("It was proper for the trial court to enjoin Lockhart from using such information because he is still in a position to use it."). Here, Pike was previously the general manager for EMC Products and had access to EMC Cement's trade secrets. However, the record shows that immediately after the foreclosure sale, Pike went to work for VHSC, another cement-manufacturing company, and tried to patent EMC Products' trade secrets. Furthermore, Pike admitted that VHSC continued to use EMC Products' trade secrets until at least May 2013. Clearly, Pike and VHSC were in possession of EMC Cement's trade-secret information and were in a position to use it. Accordingly, under these circumstances, imminent harm is presumed.[12]

*See IAC, Ltd.*, 160 S.W.3d at 200; *Fox*, 121 S.W.3d at 860; *T-N-T Motorsports, Inc.*, 965 S.W.2d at 24; *see also Hill*, 2011 Tex. App. LEXIS 169, at *14; *Lockhart*, 2010 Tex. App. LEXIS 1909, at *14.

### 3. Irreparable Injury and Absence of an Adequate Remedy at Law

---

[12] And to the extent that cross-appellees argue that the imminent-harm presumption only applies to temporary injunctions, we first note that cross-appellees have not cited any controlling authority to support that contention. Furthermore, "[a]s the Supreme Court of the United States has recognized, the standards applicable to requests for preliminary and permanent injunctions are 'essentially the same . . . with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success' when pursuing a preliminary injunction." *Heil Trailer Int'l Co. v. Kula*, 542 F. App'x 329, 335 (5th Cir. 2013) (not designated for publication) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008)); *see Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 546 n.12 (1987).

It is undisputed that the final two prongs of this inquiry are directly related. *See Williams v. Compressor Eng'g Corp.*, 704 S.W.2d 469, 472 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) ("When the term 'irreparable injury' is used with 'no adequate remedy at law[,]' the former term is a misnomer, because if an injury is irreparable, there is no remedy for it, adequate or inadequate."). Cross-appellees contend that EMC was not irreparably harmed by the alleged misappropriation of trade secrets because Pike was an independent contractor, and because the damage award for this claim already considered future damages.

We first reject cross-appellees' latter contention about future damages. As explained in footnote 9, the jury was asked about past damages in the charge question pertaining to misappropriation of trade secrets. As such, we cannot say that the damage award already considered future damages.

Additionally, we are not persuaded by cross-appellees' contention that Pike's work status somehow affects the analysis of this issue. The record evidence clearly established that Pike worked at EMC Products and had access to EMC Cement's trade secrets. The record also indicates that Pike, on behalf of VHSC, used the trade-secret information to attempt to file a patent, as well as market cement products manufactured by VHSC.

Furthermore, numerous courts have held the following:

- "We agree with the trial court's disregarding of the answer to the issue and its ruling that where the uncontradicted evidence shows that a former employee

is working for a direct competitor, no finding of irreparable injury is necessary to support a permanent injunction to protect trade secrets. *Williams*, 704 S.W.2d at 470.

- "Even in the best of good faith, a former technical or 'creative' employee such as Powell working for a competitor such as SRI can hardly prevent his knowledge or his former employer's confidential methods from showing up in his work. . . . The mere rendition of service in the same area would almost necessarily impart such knowledge to some degree in his subsequent employment. Powell cannot be loyal both to his promise to his former employer, EDS, and to his new obligation to his present employer, SRI. In these circumstances, the most effective protective device is to restrain Powell from working in the same computer field in which he was associated while employed by EDS." *Elec. Data Sys Corp. v. Powell*, 524 S.W.2d 393, 398 (Tex. App.—Dallas 1975, writ ref'd n.r.e.) (internal citations omitted).

- "When a defendant possesses trade secrets and is in a position to use them, harm to the trade secret owner may be presumed. . . . The threatened disclosure of trade secrets constitutes irreparable injury as a matter of law." *IAC, Ltd.*, 160 S.W.3d at 200 (internal citations omitted).

- "Texas precedent is that the threatened disclosure or use of the trade secrets of another constitutes irreparable injury as a matter of law." *Core Labs. LP v. Spectrum Tracer Servs., L.L.C.*, 532 F. App'x 904, 909 (Fed. Cir. 2013) (not selected for publication) (internal citations omitted).

Based on the foregoing case law and our review of the record, we conclude that cross-appellants established the final two prongs of the permanent-injunction analysis. And given that cross-appellants have satisfied all of the requirements for a permanent injunction, we conclude that the trial court abused its discretion in denying cross-appellants' request for a permanent injunction. *See Halliburton Energy Servs. v. Axis Techs., LLC*, 444 S.W.3d 251, 260 (Tex. App.—Dallas 2014, no pet.) ("The law is clear that injunctive relief for trade secret misappropriation must be sufficient to protect the

plaintiff's legal rights and remove the competitive advantage obtained through the misappropriation."); *Noell*, 431 S.W.3d at 712; *John Paul Mitchell Sys.*, 17 S.W.3d at 732; *see also McCarver*, 2015 Tex. App. LEXIS 8241, at *3. We therefore sustain cross-appellants' sole issue on cross-appeal.

## IX. CONCLUSION

In sum, with respect to the direct appeal, we modify the Amended Final Judgment to reflect that Pike is not liable for intentionally interfering with his own Management Agreement and affirm the Amended Final Judgment in all other respects. With respect to the cross-appeal, we reverse the trial court's denial of cross-appellants' request for a permanent injunction and remand for proceedings consistent with this opinion.


AL SCOGGINS
Justice

Before Chief Justice Gray,
    Justice Davis, and
    Justice Scoggins
*(Chief Justice Gray dissenting)
Affirmed as modified, in part, and reversed and remanded, in part
Opinion delivered and filed June 7, 2017
[CV06]

